UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEAN BEST,

               Plaintiff,

     -v-

NEW YORK CITY DEPARTMENT OF
CORRECTION, DEPUTY PEREZ, JOHN DOE,
CAPTAIN MERCED, WARDEN GEORGE
OKADA, CAPTAIN KURTAZ, CAPTAIN A.
TAYLOR, O'CONNOR, JOHN DOE, and THE CITY
OF NEW YORK,

             Defendants.

Case No. 12-CV-7028 (KMK)

OPINION AND ORDER

Appearances:

Sean Best
Elmira, NY
*Pro Se Plaintiff*

Ryan Shaffer, Esq.
Office of the Corporation Counsel of the City of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

      Pro se Plaintiff Sean Best ("Best") brings this Action under 42 U.S.C. § 1983, alleging

that Defendants New York City Department of Correction ("NYC DOC"), Deputy Perez,

Captain Merced, Warden George Okada ("Warden Okada"), Captain Kurtaz, Captain A. Taylor

("Captain Taylor"), "O'Connor," the City of New York ("the City"), and two John Does violated

his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Defendants the City, Captain Merced, O'Connor, and Warden Okada move to dismiss all claims

that Plaintiff asserts against them.  For the following reasons, Defendants' Motion to Dismiss is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The events giving rise to the instant Action began on March 5, 2009, at which time Plaintiff was a pretrial detainee at the Metropolitan Detention Center ("MDC") in Brooklyn, New York.  (*See* Am. Compl. 2, 4.)[1]  On that date, Plaintiff "received an infraction,"  (*id.* at 4), which appears to have been based at least in part on allegations that he possessed drugs, (*see id.* at 9 ("Based on the . . . denial of request to review physical evidence or photo copies of alleged illicit drugs . . . ."); *see also* Pl.'s Opp'n to Defs.' Mot. to Dismiss Pl.'s Am. Compl. ("Pl.'s Opp'n") 6 ("Plaintiff was charged with possession of contraband marijuana . . . .").)

---

[1] The Court's factual summary is based on the allegations contained in Plaintiff's Amended Complaint, which allegations the Court assumes to be true for the purposes of Defendants' Motion.  Plaintiff used a Southern District of New York pro-se-complaint form to submit his Amended Complaint, which form is paginated.  However, Plaintiff supplemented the form with handwritten pages of his own, which he inserted in between the form's pages.  For ease of reference, the Court will cite to Plaintiff's Amended Complaint as if it were a single, consecutively paginated document.

As will become clear as this Opinion progresses, Plaintiff's status as a pretrial detainee when the events giving rise to the instant Action took place bears directly on the legal standard applicable to Defendants' Motion.  Although Plaintiff does not specifically allege that he was a pretrial detainee at that time in his Amended Complaint, he does so in his Opposition to Defendants' Motion.  (*See* Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") 5 ("I was a *pretrial detainee* at the time of this incident in the [Amended Complaint].").)  Further, in their Reply Memorandum, Defendants seem to accept Plaintiff's characterization.  (*See* Defs.' Reply Mem. in Supp. of Their Mot. to Dismiss Pl.'s Am. Compl. ("Defs.' Reply Mem.") 2 ("In his Opposition, Plaintiff states that because he was a pre-trial detainee at the time he was placed in segregated housing, he had a protected liberty interest that he could not be deprived of without a due process hearing.  Indeed, pretrial detainees have a liberty interest in being free from punishment prior to conviction under the Due Process clause." (internal quotation marks omitted)).)  Therefore, for the purposes of resolving Defendants' Motion, the Court will assume that Plaintiff was a pretrial detainee during the relevant time period.

A hearing related to Plaintiff's infraction was held on March 10, 2009.  (*See* Am. Compl. at 4.)  Plaintiff alleges that, at the hearing, Captain Taylor, who appears to have been the presiding officer, "failed to furnish [Plaintiff] with any physical evidence or any reports of the alleged contraband—no photo copies, no chain of custody, no drug test results . . . ."  (*Id.* at 7.)  Plaintiff further alleges that Captain Taylor "failed [to provide Plaintiff with] the opportunity to call [his] witness . . . ."  (*Id.* at 7; *see also id.* at 9 ("Based on the denial of witnesses with no reason given . . . .").)  Upon the hearing's conclusion, Plaintiff was told that he would receive a disposition within 72 hours.  (*See id.* at 4.)  On the night of March 10, 2009, Plaintiff was "served with a disposition by Capt[ain] Kurtaz."  (*Id.*)  When Plaintiff "looked at the disposition[, he] realized that there was no signature by an adjudicating capt[ain]."  (*Id.*)  "In fact[,] half of the whole disposition was not filled out."  (*Id.*)  Plaintiff alleges that the disposition was "not even clear on whether the charges were dismissed or not," or on "anything" at all.  (*Id.* at 8.)  After explaining these deficiencies to Captain Kurtaz, Plaintiff "refused to sign for" the disposition, which he viewed as "invalid."  (*Id.* at 4.)

Following Plaintiff's receipt of the disposition, "[a]s a result of [the] infraction," he was "moved from [MDC] . . . , which was easily accessible by his attorney and[/]or family, to [the George R. Vierno Center ("GRVC") on] Rikers Island . . . [,] which is located . . . several hours away from [Plaintiff's] family, friends, and his attorney."  (*Id.* at 12.)  After he arrived at GRVC, Plaintiff alleges that he was "placed in punitive segregation . . . ."  (*Id.* at 2.)  While in segregated housing, Plaintiff claims that he was "deprived of access to remedial programming," and "denied the ability to have in on trade and craft as a barber."  (*Id.* at 12.)  Plaintiff further claims that he was denied "access to something so basically fundamental as hot water, each and every day at least once"; that he was only provided with access to showers three times per week;

and that he was only permitted "outside recreation in a one man cage" for "one hour a day at times where minimal sunlight [was] provided . . . ." (*Id.*)

In his Amended Complaint, Plaintiff does not allege for how long he remained in segregated housing. However, he does allege that he repeatedly challenged the validity of his disposition and resultant placement in segregated housing in communications with various MDC and GRVC officials and in New York state court, but to no avail. (*See id.* at 4–5 ("I submitted an appeal to ADW O'Connor and Warden Okada at MDC as I was told to do. I received no response from them."); *id.* at 5 ("I spoke to Capt[ain] Merced . . . and explained to him that I was illegally in [segregated housing]. I showed him the disposition. I also gave him a copy. He told me he gave it to his superior officer Dep. Perez. As soon as I was able to speak to Dep. Perez, I explained to him my contentions and gave him a copy personally . . . ."); *id.* at 6 ("I continued to make the same contentions[] to Dep. Perez, the Warden of [GRVC], Capt[ain] Merced, and everyone who would listen."); *id.* ("I finally made it to writ court. I was told the issue was unprecedented and my writ was dismissed. However it should be noted that it was never heard.").) Plaintiff claims that he was not removed from segregated housing even though the officials with whom he communicated acknowledged that his placement there was illegal. (*See id.* ("[T]hough all aforementioned parties knew I was held illegally[,] no one did anything about it."); *id.* at 5 ("I asked [Dep. Perez] . . . why was I still in [segregated housing]? His exact words were[,] 'The Big Wigs [sic] downtown said it's better for you to have a lawsuit for being illegally confined, than for you to be released . . . .'").)

Plaintiff alleges that, some time after he was placed in segregated housing, "while being transported to court, handcuffs [were] placed behind [Plaintiff's] back and [he was] placed in a cage with no seatbelt or a way to protect [himself] in case of a sudden stop or accident." (*Id.* at

4

8.)  Plaintiff also alleges that, "while riding[, he sat] on a slippery seat that cause[d] [him] to continuously slide." (*Id.*)  "On [his] way to court, the bus kept stopping short and [Plaintiff] continued to bump [his] head on the gate in front of [him]." (*Id.*)  Plaintiff "complained to the driver." (*Id.*)  After Plaintiff arrived at the courthouse, he "was tak[en] to [the medical center] at [MDC]," where "[his] injuries were assessed and an injury report was filed." (*Id.*)  Plaintiff claims that, as a result of the injuries that he sustained during this trip, "[his] neck and shoulders were injured," and that "[he has] to take medication for migraine headaches . . . ." (*Id.* at 4.)

B.  Procedural Background

On September 14, 2012, Plaintiff filed a Complaint.  (*See* Dkt. No. 1.)  Plaintiff's case was assigned to this Court on November 7, 2012.  (*See* Dkt. No. 4.)  On March 1, 2013, Plaintiff filed an Amended Complaint.  (*See* Dkt. No. 15.)  On May 24, 2013, Defendants Captain Merced, O'Connor, Warden Okada, and the City filed a Motion to Dismiss.  (*See* Dkt. No. 28.) In their accompanying Memorandum of Law, the moving Defendants note that their Motion to Dismiss is "not made on behalf of Defendants 'Dep. Perez,' 'Kurtaz,' 'DOC,' or 'A. Taylor' who have not been properly served."  (Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss Pl.'s Am. Compl. ("Defs.' Mem.") 1 n.1.)[2]  Plaintiff submitted his Opposition to Defendants' Motion on June 17, 2013,  (*see* Dkt. No. 32), in response to which Defendants submitted a Reply Memorandum of Law on August 1, 2013, (*see* Dkt. No. 36), at which point Defendants' Motion was fully submitted.

---

[2] Plaintiff disputes Defendants' claim that Deputy Perez, Captain Kurtaz, and Captain Taylor have not been properly served.  (*See* Pl.'s Opp'n 1.)  However, the Court need not resolve this dispute in this Opinion, as it will limit its consideration to the arguments raised by Defendants on behalf of whom the Motion to Dismiss was submitted.

<u>II.  Analysis</u>

<u>A.  Standard of Review</u>

Defendants move to dismiss Plaintiff's Amended Complaint under Rule 12(b)(6) of the

Federal Rules of Civil Procedure.  "While a complaint attacked by a Rule 12(b)(6) motion to

dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds

of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555

(2007) (citations, internal quotation marks, and alterations omitted).  Indeed, Rule 8 of the

Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint

suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal

quotation marks and alterations omitted).  Instead, a complaint's "[f]actual allegations must be

enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

Although "once a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege

"only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff

has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[]

complaint must be dismissed," *id.; see also Iqbal*, 556 U.S. at 679 ("Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.  But where the well-

pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation

omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8

6

marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007); *see also Nielsen v. Rabin*, — F.3d —, 2014 WL 552805, at *2 (2d Cir. Feb. 13, 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ."); *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (internal quotation marks and alterations omitted)).  Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, — F. Supp. 2d —, 2014 WL 182341, at *1 n.1 (S.D.N.Y. Jan. 16, 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,] . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (citation, internal quotation marks, and some alterations omitted); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks

omitted)); *Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

Because Plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, — F. Supp. 2d —, 2013 WL 5863561, at *2 (S.D.N.Y. Oct. 31, 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (internal quotation marks omitted)).

## B.  Analysis

"Plaintiff purports to allege claims under the Fourteenth Amendment for violations of his rights to due process and equal protection, as well as a claim under the Eight[h] Amendment for cruel and unusual punishment."  (Pl.'s Opp'n 1.)  The Court will address each claim in turn.

### 1.  Fourteenth Amendment—Due Process

Boiled down to its essence, Plaintiff's Fourteenth Amendment due-process claim is that Defendants failed to provide him with sufficient process at his infraction hearing, which hearing resulted in an unfavorable disposition, and which disposition in turn resulted in his transfer from MDC to segregated housing at GRVC.  (*See generally* Pl.'s Opp'n 5–8.)  Specifically, Plaintiff claims that the process with which he was afforded was insufficient in three ways: (1) "Captain Taylor . . . failed to furnish [him] with any physical evidence or any reports of the alleged contraband—no photo copies, no chain of custody, no drug test results," (Am. Compl. 7); (2)

"Capt[ain] Taylor failed [to provide Plaintiff with] the opportunity to call [his] witness," (*id.*); and (3) the disposition that he received after the conclusion of the hearing was unsigned and incomplete, (*see id.* at 4, 8).

The main argument that Defendants raise in their Memorandum of Law as to why Plaintiff's due-process claim should be dismissed is that Plaintiff's "confinement . . . did not give rise to any protected liberty interest," as "[d]isciplinary confinement only implicates a protected liberty interest when it is an 'atypical, significant deprivation in which a State might conceivably create a liberty interest.'" (Defs.' Mem. 5 (quoting *Sandin v. Conner*, 515 U.S. 472, 486 (1995)).)  In response, Plaintiff argues that Defendants seek dismissal of his due-process claim under an incorrect legal standard, as "many courts have ruled that [*Sandin*] does not apply to pretrial detainees." (Pl.'s Opp'n 6.)

Plaintiff is correct.  As the Second Circuit stated in *Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007), "*Sandin* does not apply to pretrial detainees and . . . accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process."  490 F.3d at 163, *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *see also Johnston v. Maha*, 460 F. App'x 11, 14 (2d Cir. 2012) ("The District Court erred in applying *Sandin* . . . to [the plaintiff], who . . . was a pretrial detainee."); *Dorlette v. Butkiewicus*, No. 11-CV-1461, 2013 WL 4760943, at *12 n.16 (D. Conn. Sept. 4, 2013) ("As subsequent cases have recognized, the standard set out in *Sandin* applies to convicted prisoners and not the rights of pretrial detainees who have not yet been convicted of any crime.  The test for a pre-trial detainee's liberty interest follows a different framework than that set out in *Sandin* . . . ." (citation and internal quotation marks omitted)); *Patterson v. City of New York*, No. 11-CV-7976, 2012 WL 3264354, at *4 n.5 (S.D.N.Y. Aug. 9,

2012) (rejecting the defendants' argument that the pretrial-detainee plaintiff's claims should be dismissed on the grounds that the violations that the plaintiff had alleged did not impose an "atypical and significant hardship" on the plaintiff because "*Sandin* . . . does not apply to pretrial detainees").  Rather, "[the Second] Circuit has found that procedural due process requires that pretrial detainees can only be subjected to segregation or other heightened restraints if a pre-deprivation hearing is held to determine whether any rule has been violated."  *Johnston v. Maha*, 606 F.3d 39, 41 (2d Cir. 2010).

In their Reply Memorandum, Defendants implicitly acknowledge their error, and agree with Plaintiff that, because "'pretrial detainees have a liberty interest in being free from punishment prior to conviction under the Due Process Clause,'" "'a pretrial detainee is entitled to a due process hearing before prison officials may impose restraints on the detainee's liberty for disciplinary reasons.'" (Defs.' Reply Mem. 2 (quoting *Mitchell v. Dep't of Corr.*, No. 05-CV-5792, 2008 WL 744041, at *12 (S.D.N.Y. Feb. 20, 2008), *adopted as modified by* 2008 WL 744039 (S.D.N.Y. Mar. 19, 2008).)  Defendants also correctly state that, "[i]f the purpose of the pre-trial detainee's detention is punitive, then 'it is governed by the standard set forth in *Wolff v. McDonnell*, [418 U.S. 539 (1974),] which requires (1) written notice of the charges [against the detainee] at least twenty-four hours before any hearing, (2) a written statement of factual allegations against the [detainee], and (3) at least a limited ability to present witnesses and evidence.'" (Def.'s Reply Mem. 2 (quoting *Taylor v. Santana*, No. 05-CV-1860, 2007 WL 737485, at *4 (S.D.N.Y. Mar. 6, 2007), *aff'd sub nom. Taylor v. Comm'r of N.Y.C. Dep't of Corrs.*, 317 F. App'x 80 (2d Cir. 2009).)  *See also Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001) ("[T]he procedures required by *Wolff* apply if the restraint on liberty is imposed for disciplinary reasons . . . ."); *Muhmmaud v. Murphy*, No. 08-CV-1199, 2009 WL 4041404, at *6

(D. Conn. Nov. 19, 2009) ("Before a pretrial detainee may be punished, he must be afforded the procedural protections set forth in *Wolff* . . . .  The detainee cannot be punished until after the hearing is held.  He must be afforded written notice of the charges at least twenty-four hours before the hearing and the opportunity to present witnesses and evidence in his defense.  He also must be provided a written statement of the reasons for the decision.").

However, Defendants argue that, "in both his Opposition and Complaint, Plaintiff himself asserts that his detention was administrative and not punitive," (Def.'s Reply Mem. 4), and that as a result, Plaintiff's due-process claim is governed not by *Wolff*, but by "'the less protective standard established by the Supreme Court in *Hewitt v. Helms*, 459 U.S. 460 [1983],'" which standard requires only that a pretrial detainee "'receive some notice of the charges against him and an opportunity to present his views' to the prison official charged with deciding whether to impose the restraint," (*id.* at 4–5 (quoting *Taylor*, 2007 WL 737485, at *4)).

Defendants accurately describe the legal standard that applies to a pretrial detainee's claim that his administrative detention violated the Due Process Clause.  *See Benjamin*, 264 F.3d at 190 ("[I]f the restraint is for 'administrative' purposes, the minimal procedures outlined in *Hewitt* are all that is required."); *Allah v. Milling*, No. 11-CV-668, 2013 WL 6072723, at *9 (D. Conn. Nov. 19, 2013) (noting that *Hewitt* applies to a pretrial detainee's due-process claim if the detainee's confinement was administrative).  But they mischaracterize Plaintiff's Opposition and Amended Complaint, in the latter of which Plaintiff has sufficiently alleged that his segregation was punitive and not administrative in nature.

"Absent a showing of an expressed intent to punish, the determination whether a condition is imposed for a legitimate purpose or for the purpose of punishment generally will turn on whether an alternative purpose to which the restriction may rationally be connected is

11

assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Benjamin*, 264 F.3d at 188 (internal quotation marks and alterations omitted) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)); *see also Williams v. Ramos*, No. 13-CV-826, 2013 WL 7017674, at *3 (S.D.N.Y. Dec. 23, 2013) (same); *LaRock v. Amato*, No. 12-CV-503, 2013 WL 5466410, at *12 (N.D.N.Y. Sept. 30, 2013) (same).  Here, the Court need not reach the question of whether there was an "alternative purpose" to which Plaintiff's placement in segregated housing "may rationally be connected," or whether such placement was "excessive" in relation to such alternative purpose, because Plaintiff has alleged "an express intent to punish."

Specifically, in his Amended Complaint, Plaintiff alleges that he was placed in segregated housing as a result of the disposition that he received following his infraction hearing—an infraction hearing that was held at least in part in response to allegations that Defendant possessed drugs.  (*See, e.g.*, Am. Compl. 12 ("As a result of this infraction[,] [Plaintiff] was moved from [MDC] . . . to [GRVC] . . . .")  As one court within the Second Circuit has observed, "special confinement based upon a disciplinary violation rings of punishment . . . ." *Shine v. Hofmann*, No. 06-CV-237, 2009 WL 2179969, at *5 (D. Vt. July 22, 2009); *see also Benjamin*, 264 F.3d at 190 ("[T]he procedures required by *Wolff* apply if the restraint on liberty is imposed for disciplinary reasons."); *Mitchell*, 2008 WL 744041, at *13 ("The . . . Second Circuit has held that a pretrial detainee subject to discipline for an infraction is entitled to the due process protections set forth in *Wolff* . . . ."); *cf. Jeffers v. City of New York*, No. 13-CV-3305, 2013 WL 5437337, at *3–4 (E.D.N.Y. Sept. 27, 2013) (dismissing without prejudice the pretrial-detainee plaintiff's claim that the defendants violated his due-process rights by placing him in "punitive segregation" following his receipt of an allegedly "false

12

infraction" based on a correction officer's "false statement," but only because the plaintiff had "fail[ed] to allege the content of [the correction officer's] false charges against him, when or how they were presented to him or what, if any, process he sought and/or received in relation to those charges").  Such a confinement rings particularly loudly when at least one of the disciplinary violations with which the pretrial detainee is charged is non-violent in nature, which suggests that the detainee's special confinement is not based on a "legitimate penological reason, such as the safety and security of other inmates or prison staff."  *Allah*, 2013 WL 6072723, at *7. Here, as noted above, at least one of the disciplinary violations with which Plaintiff was charged was possession of contraband.  (*See* Am. Compl. 7, 9.)  What is more, Plaintiff has also alleged that one of Defendants characterized his confinement as "punitive," not administrative, "segregation."  (*See id.* at 6 ("Dep. Perez told me[,] 'I'm technically just holding you in Punitive Segregation.").)

The only allegations to which Defendants direct the Court's attention in support of their contention that "Plaintiff himself asserts that his detention was administrative and not punitive," (Defs.' Reply Mem. 4), are the following:

> When Dep. Perez made rounds I asked him what happen[]ed and why was I still in [punitive segregation]?  His exact words were[,] "The Big Wigs downtown said it's better for you to have a lawsuit for being illegally confined, than for you to be released and assault someone in Population [because of my] [alleged] SRG status."

(Am. Compl. 5 (third and fourth alterations in original).)

However, while this alleged statement might provide some evidence that Defendants' reasons for *keeping* Plaintiff in segregated housing were motivated by administrative concerns instead of punitive intent, it still does not conclusively speak to Defendants' rationale for *placing* Plaintiff in segregated housing in the first place.  Additionally, the statement came from an

13

officer who appears to have played no role whatsoever in that initial decision.  But most importantly, to the extent that the statement cuts against the substantial allegations that Plaintiff has made in support of his argument that his confinement was punitive, it merely creates a factual dispute, the resolution of which, "in the absence of any discovery or evidentiary hearing, is not appropriate on a motion to dismiss."  *Trs. of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation, Pension & Welfare Funds v. Dykeman Carpentry, Inc.*, No. 13-CV-1508, 2014 WL 976822, at *6 (E.D.N.Y. Mar. 12, 2014) (internal quotation marks omitted).

Lastly, Defendants argue that, "to the extent that Plaintiff claims his detention was punitive, it is clear that he was provided with the necessary due process protections set forth in *Wolff*," as the hearing report attached to Plaintiff's own complaint: "shows that Plaintiff was found guilty of some charges while other were dismissed"; "contains a statement of the basis for findings and evidence relied on"; and "shows that [Plaintiff] signed portions of the report and was given the opportunity to request witnesses and have assistance at the hearing, which he declined."  (Defs.' Reply Mem. 5 (internal quotation marks omitted).)  As an initial matter, the Court notes that Plaintiff did not attach the report to his Amended Complaint, although he did attach it to his original Complaint.  Nevertheless, even though the report falls outside the four corners of the Amended Complaint, the Court is still permitted to consider it at this stage of the litigation, as the allegations in Plaintiff's Amended Complaint make clear that the report is "in [Plaintiff's] possession," and is also a document "of which [Plaintiff] had knowledge and relied on in bringing suit."  *Kalyanaram*, 742 F.3d at 44 n.1 (internal quotation marks omitted).  (*See, e.g.*, Am. Compl. 7 (reproducing a portion of the report).)

14

Regardless, nothing contained in the report alters the Court's conclusion; in fact, to a certain extent, the report strengthens it.  Titled "Hearing Report and Notice of Disciplinary Disposition," the report contains a line that asked, "Inmate requested Witness(es)," with boxes for "Yes," "No," "Waived," "Request Granted," and "Denied," that the person filling out the report could check, all of which is followed by the statement, "(If waived, inmate must sign.  If denied state reason.)."  (*See* Compl. 12.)[3]  Here, the person who filled out the form is listed on a line titled "Adjudication Officer" as "A Taylor Capt 547," and he checked the box for "Yes." (*Id.*)  Underneath the boxes, there is space for the person filling out the form to explain the "Reason" for his selection of a particular box.  (*Id.*)  In this case, the person who filled out the form wrote, "Inmate stated not needed (witness)."  There are also lines titled, "Inmate requested Hearing Facilitator," and "Inmate Requested Interpreter," with the same box options as those described above following that text, in this case both of which "No" boxes were checked.  (*Id.*) Below the lines titled, "Inmate requested Hearing Facilitator," and "Inmate Requested Interpreter," a signature that appears to be Plaintiff's appears.  (*Id.*)  However, below the line titled, "Inmate requested witnesses," no such signature appears.  (*Id.*)

In Plaintiff's Amended Complaint, he writes, "Capt[ain] Taylor failed [sic] me the opportunity to call my witness and I did not waive them [sic].  If I'd waived them my signature would've been required.  Note it's absent."  (Am. Compl. 7.)  Thus, when read in conjunction with one another, all that can be gleaned from the report and the Amended Complaint is that Captain Taylor and whichever other Defendants or unnamed parties who might have been

---

[3] Like Plaintiff's Amended Complaint, Plaintiff also supplemented the form that he used to submit his Complaint with handwritten pages of his own.  As such, the Court will cite to Plaintiff's Complaint as if it were a single, consecutively paginated document as well.  *See supra* note 1.

involved with Plaintiff's infraction hearing took the position that, although Plaintiff did not waive his right to request witnesses, he stated at some point after having requested to call a witness that he would not need that witness at his hearing, while Plaintiff alleges that he was denied and did not waive his right to call such witness.  Once again, to the extent that the statement in the report that Plaintiff "stated [at his hearing that his witness was] not needed" contradicts Plaintiff's claim that Captain Taylor "failed [to provide Plaintiff with] the opportunity to call [his] witness," such statement merely creates a factual dispute, the resolution of which, "in the absence of any discovery or evidentiary hearing, is not appropriate on a motion to dismiss."  *Dykeman Carpentry*, 2014 WL 976822, at *5 (internal quotation marks omitted).

As noted above, "[t]he *Wolff* Court, while holding that full adversary proceedings are not required for disciplinary deprivations of liberty in the prison setting, required . . . a limited ability to present witnesses and evidence."  *Benjamin*, 264 F.3d at 190 (footnote omitted); *see also Wolff*, 418 U.S. at 566 ("We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.").  Here, Plaintiff has plausibly alleged that his placement in segregated housing was punitive and not administrative in nature, and that he was denied his limited right to present witnesses at his infraction hearing.  Accordingly, Defendants' Motion To Dismiss Plaintiff's Fourteenth Amendment due-process claim is denied.

### 2.  Fourteenth Amendment—Equal Protection

Plaintiff also purports to assert a Fourteenth Amendment equal-protection claim.  (*See generally* Pl.'s Opp'n 10–19.)  "Where . . . [a] [p]laintiff does not claim to be a member of a protected class, he may bring an equal protection claim under one of two theories: selective

16

enforcement or 'class of one.'" *Rankel v. Town of Somers*, — F. Supp. 2d —, 2014 WL 715702, at *11 (S.D.N.Y. Feb. 25, 2014).  Plaintiff does not claim to be a member of a protected class in his Amended Complaint, and the only two equal-protection theories that he discusses in his Opposition are selective enforcement and class of one.  (*See* Pl.'s Opp'n 14–19 (discussing Plaintiff's selective-enforcement claim); *id.* at 10–14 (discussing Plaintiff's class-of-one claim).)

"To state a selective-enforcement claim, a plaintiff must plead: (1) he was 'treated differently from other similarly situated' individuals and (2) 'that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Rankel*, 2014 WL 715702, at *11 (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007)); *see also Martine's Serv. Ctr., Inc. v. Town of Wallkill*, — F. App'x —, 2014 WL 321943, at *2 (2d Cir. Jan. 30, 2014) ("An equal protection claim premised on selective enforcement requires a showing that (1) compared with others similarly situated, [the plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitution rights, or by a malicious or bad faith intent to injure [the plaintiff]." (internal quotation marks and some alterations omitted)); *Felmine v. City of New York*, No. 09-CV-3768, 2011 WL 4543268, at *29 (E.D.N.Y. Sept. 29, 2011) (applying the same standard to a selective-enforcement claim asserted by a pretrial detainee).

"Under a class-of-one theory, a plaintiff must allege that he has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Rankel*, 2014 WL 715702, at *11 (quoting *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010)); *see also Town of Wallkill*, 2014 WL 321943, at

17

*2 ("To state a class-of-one equal protection claim the plaintiff must allege that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." (internal quotation marks and alterations omitted)); *McNair v. Kirby Forensic Pyschiatric Ctr.*, No. 09-CV-6660, 2010 WL 4446772, at *9 (S.D.N.Y. Nov. 5, 2010) (applying the same standard to a class-of-one claim asserted by a pretrial detainee).

Thus, "both selective enforcement and class of one [equal-protection theories] require that the plaintiff sufficiently plead the existence of 'similarly situated' others . . . ." *Segreto v. Town of Islip*, No. 12-CV-1961, 2014 WL 737531, at *6 (E.D.N.Y. Feb. 24, 2014). In *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679 (S.D.N.Y. 2011), this Court explained the different similarly-situated standards applicable to both types of claims:

> In a class of one case, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high . . . . [T]he comparators's circumstances must be prima facie identical. Thus, a plaintiff in . . . a class of one case is required to show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.
> . . . .
>
> [C]ourts have applied a slightly less stringent similarly situated standard in the selective enforcement context. They have held that plaintiffs claiming selective enforcement must compare themselves to individuals [who] are similarly situated in all material respects . . . . Similarly situated does not mean identical, but rather a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, to the extent that an objectively identifiable basis for comparability exists.
>
> To satisfy this less-demanding test in the selective enforcement context, plaintiffs must identify comparators whom a prudent person would think were roughly equivalent, but plaintiffs need not show an exact correlation between themselves and the comparators. . . . Exact correlation is neither likely or necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.

815 F. Supp. 2d at 693, 696 (citations, internal quotation marks, and alterations omitted); *see also DePrima v. City of New York Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *5 (E.D.N.Y. Mar. 20, 2014) ("In order to satisfactorily state a claim, the Court must determine . . . whether it is plausible that a reasonable jury could ultimately conclude that Plaintiff is similarly situated to an alleged comparator.  Even under the less-demanding standard, well-pled facts showing that the plaintiff has been treated differently from others similarly situated remains an essential component of such a claim and conclusory allegations of selective treatment are insufficient to state an equal protection claim." (citation, internal quotation marks, and alterations omitted)).

Here, as Defendants argue, Plaintiff's selective-enforcement and class-of-one equal-protection claims fail, as Plaintiff has not alleged any facts that suggest that he was treated differently than were any other similarly-situated individuals.  The arguments to the contrary that Plaintiff raises in his Opposition are unavailing.  As to his class-of-one claim, Plaintiff states that, "[a]fter going to writ court[,] . . . the judge as well as . . . [D]efendants['] attorney stated that 'this situation was unprecedented,' and because they never saw an unsigned disposition, they didn't know how to deal with the situation, . . . [which] shows that this is a class of one situation."  (Pl.'s Opp'n 11.)  Even assuming that a third party's general statement that a plaintiff's situation was "unprecedented" could be sufficient to establish the existence of similarly-situated individuals under any circumstances, in this case, there is no information in Plaintiff's Amended Complaint as to the types of "situations" that the judge and attorney whom Plaintiff references had seen in the past, nor whether the circumstances of the individuals involved in such situations were "prima facie identical" to those of Plaintiff.  *See Mosdos*, 815 F. Supp. 2d at 693.  For example, the infractions with which such individuals were charged might

have differed in substance or number from those that were the subject of Plaintiff's hearing. *See Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 97 (2d Cir. 1994) (in a case involving a plaintiff's termination following her alleged misconduct, affirming the district court's grant of summary judgment against the plaintiff on her equal-protection claim in part because the district court had found that the other employees who the plaintiff claimed were similarly situated to her, which employees had also been accused of misconduct, "engaged in [mis]conduct different in kind to that attributed to" the plaintiff); *Dejarnett v. Willis*, — F. Supp. 2d —, 2013 WL 5526154, at *9 (M.D. Ala. Oct. 4, 2013) (in a case involving a plaintiff's termination following her alleged violation of her employer's policies, rejecting the plaintiff's equal-protection claim that a similarly situated co-worker who had also violated the employer's policies was treated less harshly, because "[t]he nature of the[] offenses" with which the plaintiff and her co-worker were accused were "starkly different"); *Roberts v. Taylor*, No. 10-CV-280, 2013 WL 5236614, at *2, *8 (E.D. Okla. Sept. 17, 2013) (in a case involving a plaintiff's removal from a delayed-sentencing program and subsequent placement in prison following the plaintiff's "multiple rule violations," rejecting the plaintiff's equal-protection claim that a similarly situated "Caucasian in the same program received a more lenient sentence" following that participant's rule violation, in part because the plaintiff had "not allege[d] [that] the other participant had as many program infractions as [the plaintiff]"); *B.M.D. ex rel. Dickerson v. Knox Cnty., Tenn.*, No. 07-CV-73, 2009 WL 677776, at *10 (E.D. Tenn. Mar. 10, 2009) ("Co[-]conspirators are not similarly situated if their role in the commission of an offense was significantly different."); *Doe v. Edgar*, 562 F. Supp. 66, 69 (N.D. Ill. 1982) (rejecting the plaintiff's equal-protection claim on the grounds that the type of driving offense with which he had been charged was "fundamentally

different" from the driving offense with which the other drivers to whom he claimed he was similarly situated had been charged), *aff'd*, 721 F.2d 619 (7th Cir. 1983).

Plaintiff also argues that "[a] review of [NYC DOC] records will show others who have appealed, received answers, favorable or not a response was given." (Pl.'s Opp'n 14.) First, this argument could only possibly relate to the existence of similarly-situated individuals in regard to any claim that Plaintiff might be seeking to assert on the basis of Defendants' failure to respond to his appeal *after* he was transferred to segregated housing, but could not relate to the existence of such individuals in regard to his claim that he was afforded insufficient process *before* he was transferred, or to the transfer itself, which latter two claims the Court construes to be the main thrust of any equal-protection allegations that Plaintiff may be seeking to make in his Amended Complaint.[4] Moreover, Plaintiff does not allege that he has reviewed, or that he has any personal knowledge of the contents of, the NYC DOC records that he mentions; instead, he appears to be assuming that such records exist, and that they will reveal the existence of similarly-situated individuals, without any factual basis for that assumption, which unfounded assumption is an insufficient basis upon which to state a claim. *See Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008) ("It is not proper to assume that the [plaintiff] can prove facts which [he has] not alleged or that the defendants have violated the laws in ways that have not been alleged." (internal quotation marks and alterations omitted) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983)).

---

[4] To the extent that Plaintiff is attempting to assert an equal-protection claim on the basis of Defendants' alleged failure to respond to his appeal, as opposed to Defendants' alleged failure to provide him with due process before transferring him to segregated housing, Plaintiff should make that clear in any subsequent version of his Complaint that he may choose to file.

As to his selective-enforcement claim, Plaintiff appears to admit in his Opposition that he has not adequately pleaded the existence of similarly-situated individuals.  (*See* Pl.'s Opp'n 15 ("Plaintiff did not state what the defendants believe he should have . . . .").)  Further, for the most part, Plaintiff raises the same arguments that he does in the class-of-one context, which arguments the Court has already rejected.  (*See id.* at 15 ("That 'writ' was withdrawn due to allegations of 'invalid' 'unsigned' disposition being an unprecedented issue."); *id.* ("[NYC DOC] corrections records will show others['] appeals at least got a response.").)  Plaintiff also asserts in conclusory fashion that "[i]t's safe to say [NYC DOC] doesn't make a habit of violating the U.S. Constitution," (*id.*), and that "others similarly situated were able to get a judicial intervention at writ court due to established laws," (*id.*), without providing any information as to who those others were, or what their circumstances were.  *See Henry*, 42 F.3d at 97; *Dejarnett*, 2013 WL 5526154, at *9; *Roberts*, 2013 WL 5236614, at *8; *B.M.D.*, 2009 WL 677776, at *10; *Edgar*, 562 F. Supp. at 69.

Finally, Plaintiff argues that "it's safe to assume that it's clear by the very nature of prison and the claims stated in [the Amended Complaint] that there [were] other individuals similarly situated as plaintiff.  That point is obvious."  (Pl.'s Opp'n 15 (internal quotation marks omitted).)  As discussed above, the point is not obvious, and Plaintiff is reminded once again that his unfounded assumptions as to the existence of necessary facts are insufficient to ensure the survival of his claims at the motion-to-dismiss stage.  *See Arma*, 591 F. Supp. 2d at 643.  Therefore, because Plaintiff has failed to adequately plead a required element for both class-of-one and selective-enforcement equal-protection claims, any such claims that Plaintiff may be attempting to assert in his Amended Complaint are dismissed without prejudice.

### 3.  Eighth Amendment—Cruel and Unusual Punishment

The final claim that Plaintiff asserts is that the manner in which Defendants transported him from segregated housing to court, "with no regard to [his] safety or security," violated his "[Eighth] Amendment [right] to be free and clear of cruel and unusual punishment."  (Am. Compl. 9.)  As noted above, Plaintiff alleges that "handcuffs [were] placed behind [his] back and [he was] placed in a cage with no seatbelt or a way to protect [himself] in case of a sudden stop or accident," (*id.* at 8); that, "while riding[, he sat] on a slippery seat that cause[d] [him] to continuously slide," (*id.*); that "the bus kept stopping short and [he] continued to bump [his] head on the gate in front of [him]," (*id.*); that he "complained to the driver," (*id.*); and that, as a result of the injuries that he sustained during this trip, "[his] neck and shoulders were injured," and "[he has] to take medication for migraine headaches," (*id.* at 4).

"Though Plaintiff alleges that his claim [challenging the constitutionality of the conditions of his confinement] arises under the Eighth Amendment, given that he is alleged to be a pre-trial detainee, his claim would instead arise under [the] Due Process Clause of the Fourteenth Amendment."  *Brooks v. SecurusTech.net*, No. 13-CV-4646, 2014 WL 737683, at *3 (E.D.N.Y. Feb. 24, 2014); *see also Toliver v. City of New York*, 530 F. App'x 90, 92 n.1 (2d Cir. 2013) ("[The plaintiff] claims that he suffered cruel and unusual punishment.  The district court accordingly treated his complaint as asserting violations of the Eighth Amendment.  However, . . . [the plaintiff] may have been a pretrial detainee . . . .  If so, the Eighth Amendment would not apply, as a pretrial detainee cannot be punished at all, and any . . . unconstitutional conditions claims should be analyzed under the Due Process Clause of the Fourteenth Amendment." (citations, internal quotation marks, and some alterations omitted)); *Pagan v. Westchester Cnty.*, No. 12-CV-7669, 2014 WL 982876, at *16 (S.D.N.Y. Mar. 12, 2014)

23

("Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment rather than by the Eighth Amendment's prohibition on cruel and unusual punishment, which applies only to convicted prisoners." (citing, *inter alia*, *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)).  However, "[s]uch distinction is of no moment for purposes of this [Opinion] given that 'the standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment as it is under the Eighth Amendment.'"  *Brooks*, 2014 WL 737683, at *3 (quoting *Caiozzo v. Koreman*, 581 F.3d 63, 70–71 (2d Cir. 2009)); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("We have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment."); *Pagan*, 2014 WL 982876, at *16 ("Because an unconvicted detainee's rights are at least as great as those of a convicted prisoner, courts apply the same deliberate indifference test developed under the Eighth Amendment to Fourteenth Amendment claims." (internal quotation marks omitted)).

"To state an Eighth [or Fourteenth] Amendment claim based on conditions of confinement, a[] [detainee] must allege that: (1) objectively, the deprivation the [detainee] suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to [detainee] health or safety."  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and some alterations omitted).

The Second Circuit recently applied this standard to a claim that was almost identical to the one that Plaintiff asserts in this action.  In *Jabbar v. Fischer*, 683 F.3d 54 (2d Cir. 2012) (per curiam), the plaintiff, a state-prison inmate, alleged that the defendants, various state prison officials, "violated his constitutional rights under the Eighth and Fourteenth Amendments by

24

transporting him on a bus without a seatbelt." 683 F.3d at 56. The court summarized the

Plaintiff's allegations as follows:

> [The plaintiff] was transported to and from a medical appointment at an outside
> facility. . . . on [a] . . . bus that did not have seatbelts for inmate passengers . . . .
> During transport, [the plaintiff] was shackled from his wrists to his ankles. The bus
> made a forceful turn and [the plaintiff], who had fallen asleep, was thrown from his
> seat. He hit his head on another seat and was knocked unconscious. He sustained
> injuries to his face, head, and back.

*Id.* (internal quotation marks omitted).

The court began its analysis by noting that it had "not yet addressed whether the Eighth

or Fourteenth Amendments are violated when a prison official does not provide a bus seatbelt to

a prison inmate in transport," but that "[o]ther courts," including the Eighth, Eleventh, Fifth, and

Tenth Circuits, as well as "[n]umerous district courts," have "held that the failure to provide an

inmate without a seatbelt does not, standing alone, give rise to a constitutional claim." *Id.* at

57–58. After describing the cases in which those courts had so held, the Second Circuit joined

them, finding that the plaintiff's claim failed both prongs of the deliberate-indifference standard:

> First, as for the Eighth Amendment's objective requirement, the failure to provide
> a seatbelt is not, in itself, sufficiently serious to constitute an Eighth Amendment
> violation. A bus seatbelt is not a life necessity. While seatbelts may offer reasonable
> safety for the general public, on a prison bus their presence could present safety and
> security concerns. Inmates, even handcuffed or otherwise restrained, could use
> seatbelts as weapons to harm officers, other passengers, or themselves. A
> correctional facility's use of vehicles without seatbelts to transport inmates, when
> based on legitimate penological concerns rather than an intent to punish, is
> reasonable.

> Second, as for the Eighth Amendment's subjective requirement, because the absence
> of seatbelts on inmate bus transport is itself not an excessive risk, without more,
> deliberate indifference—that is, that defendants knew of, and disregarded, an
> excessive risk to inmate safety—cannot be plausibly alleged.

> Third, for the reasons stated above, under the Fourteenth Amendment, failure to
> provide an inmate with a seatbelt does not constitute a deprivation of life, liberty, or
> property.

> Here, [the plaintiff] did not allege that there was any intent to punish or other improper motivation for the lack of inmate seatbelts on the . . . bus, and we cannot reasonably infer such intent. [The plaintiff] did not allege that defendants knew of any excessive risk to inmate safety. . . . Thus, without more, the complaint failed to allege sufficient facts to state a plausible claim.

*Id.* at 58–59 (citations, internal quotation marks, and some alterations omitted).

Like the plaintiff in *Jabbar*, Plaintiff has not alleged that there was any intent to punish or other improper motivation for the lack of seatbelts on the bus here. In fact, the Court cannot find any basis on which Plaintiff's claim can be distinguished from the claim at issue in *Jabbar*. Accordingly, Plaintiff's deliberate-indifference claim is dismissed without prejudice.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion To Dismiss is granted in part and denied in part. Plaintiff's equal-protection and deliberate-indifference claims are dismissed without prejudice, while Plaintiff's due-process claim survives. Plaintiff may file a Second Amended Complaint within 30 days of the issuance of this Opinion, which Complaint may address the deficiencies that the Court has identified. Should Plaintiff fail to do so, his equal-protection and deliberate-indifference claims will be dismissed with prejudice for failure to state a claim upon which relief can be granted. Should Plaintiff file a Second Amended Complaint, Defendant will have 20 days either to answer or to submit a pre-motion letter. The Clerk is respectfully directed to terminate the pending Motion. (*See* Dkt. No. 28.)

SO ORDERED.

Dated:      March 3 /, 2014
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

26